The case is the people of the state of Illinois v. Fred Cox, case number 416-0696. For the appellant we have Mr. Lovelace and for the appellee we have Ms. Shepard. You may proceed, counsel. Good afternoon, Your Honor. Thank you. May it please the Court. Fred Cox was a 60-year-old husband and father who once worked as a livestock hauler. He is now an inmate at the Danville Correctional Center where he will most likely spend the rest of his life in prison after being sentenced to 24 years by a jury who found him guilty of predatory criminal sexual assault on December 16, 2015. There was only one witness who claimed Fred committed this crime, the alleged victim, H.V. Ten-year-old H.V. claimed that while spending the night at the Cox's home, she was sexually assaulted by Fred Cox. She claimed that she was wearing a nightgown and was awakened in the early morning hours by Fred pulling down her underwear and inserting his penis into her vagina. She said that she tried to fight him, punching him, kicked him, and screamed. She says that after a few minutes that Fred stopped, she put her underwear back on and she fell back asleep. All of this supposedly happened with Fred's wife, Christy, in the next room and Fred's daughter, G.C., lying within a few feet of H.V. in a double recliner. H.V. had a cell phone with her and only lived two blocks away. Nevertheless, she didn't want to go home the next morning and instead stayed with the Cox's, going with them to Walmart and joining them on a family outing with other family members to eat Chinese food. The Cox's drove H.V. home sometime between noon and 1 p.m. that next day. Fred's wife, Christy, described H.V. as a happy, bubbly, giggly 11-year-old girl. However, when they got to Brockton, where H.V.'s mother and her mother's boyfriend lived, she got quiet. Ella Richard, H.V.'s mom, felt something was wrong, but H.V. did not say anything to her until Ms. Richard's boyfriend, Robert Burton, got home and at that point, H.V. stated that she had been sexually assaulted by Mr. Cox. At trial, Fred testified on his own behalf, denying the allegations of any physical or sexual contact with H.V. and G.C., the girl who slept in the living room less than a foot away from H.V., testified that H.V. was wearing sleeping pants, not a nightgown. Later, after Fred was convicted, but before this appeal, DNA testing revealed that the underwear that H.V. was wearing at the Cox's home did not have any of Fred Cox's DNA on it, but rather, semen was discovered belonging to Ella Richard's boyfriend, Robert Burton. Now, counsel, with respect to that, you referred to semen and that was used in the brief. Was there a definitive finding that it was semen? Your Honor, I think there was a definitive finding by the testing that it was semen, but there was also testimony from the expert that it could have been other bodily fluids, so I can't say that the testimony was 100% sure that it was semen. Did the expert from the lab identify it as semen? I believe the expert did identify it as semen, but then on cross-examination of the state, did indicate that it had markers for semen or that they would think it would be semen, but there was a possibility that it could have come from other bodily fluids. And was there anything identified in the underpants where your client could not be excluded? There was no DNA from Fred Cox identified in the underpants. So, I think the state has argued and did argue and closed the argument and may very well argue here that the absence of DNA, this is a common argument, the absence of DNA doesn't mean that he didn't commit the crime. But the fact is the state's theory in the case was that he pulled down her underpants, he penetrated her with his penis and then he stopped at some point and then she put the underpants back on. So, part of the evidence that was collected was the underpants and it was tested to determine whether or not his DNA could be found there. That was the reason it was tested. And we know from the record there's a little bit of a history with respect to, I guess you would say, chain of custody with respect to the underwear in terms of it being allegedly put in with some other dirty laundry and then it was the minor's mother who provided the underwear to authorities, is that correct? Correct. What happened was Detective Metcalf had gone to the household where H.V. lived, I think it was after the CAC interview and asked the mother for the underwear that H.V. would have worn at the time that she returned home or the underwear that she would have worn that night. H.V.'s mother then went to the laundry pile where she believed that that underwear was and got that underwear and gave it to Detective Metcalf who then sent it for the testing. So, that is the chain of custody. And there was allegedly at least an item that would have contained probably semen on it of the boyfriend also in that pile of laundry. The state's response in the motion for a new trial was to put Ella Richards on the stand and she did testify that she and Mr. Burton, after H.V. had gone to the Cox's, did have sex. She testified that he then wiped off or wiped himself off after having sex and that that towel was in the laundry pile and that she didn't know whether or not the underwear was on top of or below, but I believe she did testify that it was near. And that was, of course, the state's argument that it was some sort of transfer of the semen from the towel to the underwear that caused that DNA result. Now, were you trial counsel in this case? I was not trial counsel. Do you know why it went to trial before the DNA analysis could be completed? I am not, Your Honor. I am not aware of why they proceeded the trial without the DNA analysis. There are five issues that we have raised in this case and I'd like to address the fourth issue that was raised first, if that's okay with the Court, because, quite frankly, if this Court would rule in our favor on this issue, it would be requiring trial courts not only to consider the four factors laid out in People v. Johnson, but also require consideration of the impact of interviewers, CAC interviewers, that they have on a child's statement made in response to interviewer's questions. So, admittedly, this is maybe a novel argument to the Court in the sense that it does depart from previous rulings, but I believe in support of this, we've asked the Court to recognize the Fifth District's ruling in People v. DeTalle, where the Court stated that there is no precise test for evaluating trustworthiness or reliability, but rather, particularized guarantees of trustworthiness must be drawn from the totality of the circumstances surrounding the victim's statements. So, we would ask the Court to recognize this ruling, which would give, then, room for this Court to require more from trial courts in evaluating the statements that are subject to the 11510 hearings. In looking at the totality of the circumstances surrounding the victim's statements, we're asking the Court to evaluate the interview by considering, one, the training and experience of the interviewer, two, the consistent adherence to protocols and the structure to ensure complete and accurate accounts of the child's experience while minimizing the introduction of specific information or input from the interviewer, and three, the objectivity of the interviewer. The appellant asks this Court to consider the Child Advocacy Act, 55 ILCS 80-1. This act establishes the requirement that forensic interviews be conducted by a trained forensic interviewer as defined by the NCA, the National Child Advocacy Standards. In this case, Sergeant Rose, who was the interviewer, only attended one 40-hour course, Finding Words, less than one year prior to interviewing H.V. There was no evidence that the Finding Words course was the current and acceptable method for effectively interviewing children. There's no evidence that he had done anything to ensure that he was adhering to any sort of protocols or best practices. In fact, he appeared unaware of these protocols or best practices, and unsure as to whether the interview questions that he was asking followed them. He had only conducted six interviews prior to interviewing H.V., and he had previously been trained on and he'd utilized the read method of interviewing and interrogating. So he was an interrogator for more than six years. He failed to initially set any ground rules or guidelines, such as the need to provide honest answers, not to guess, and that if he was wrong about anything, it was okay for H.V. to correct him. It is apparent from viewing the interview that Sergeant Rose was not using a structured interview or what nationally recognized protocols he was using, if any. On objectivity, Sergeant Rose would have this court believe that after interviewing, he moved to an investigative mode. Therefore, he was able to switch on and off whether he was interviewing or interrogating an adult versus a child. And Sergeant Rose freely admits that he knew who, what, and when the alleged incident happened in advance of his interview with H.V., and this allowed him to focus on the interview. When H.V. mentioned living near a park with pedophiles, Sergeant Rose failed to thoroughly explore the statement. A forensic interviewer's job is not to assign guilt or praise a child for making allegations or reinforce their answer, which Sergeant Rose does throughout this interview. Sergeant Rose told H.V. good job after she reported fighting back. He told her that she was bright, well-read, and I can tell you read books. He was often sportive in his demeanor. After the trial court reviewed this entire recording in the 11510 hearing, it noted that it had the opportunity to observe Deputy Rose's interview techniques and did not find it to be leading or coercive or suggestive. After reviewing this video, this court should find that no reasonable person should take this view, and therefore the court abused its discretion in admitting this recording at the trial. So Counsel, clearly with your argument, your position is that this issue has been appropriately preserved for appeal? Your Honor, my position is that it was raised in the 11510. However, it was not raised in the post-trial motion. So in my brief, I indicate that I'm asking the court to review this on plain air. And I argue in the brief that this is a closely balanced case. There is only one witness, just because that witness testified not only in person, but also through her video interview, which I indicated should not have been admitted, but also through other people does not add credibility or add more evidence. It's still her word against his. So it is a closely balanced case, and we'd ask this court to review this under plain air, closely balanced. Your Honor, there are three other issues that I raise in this appeal. They are propensity evidence issues, or propensity evidence under 725 ILCS 5115-7.3. There's no doubt that V.E.'s testimony was highly prejudicial. V.E., the State's first witness, testified that 20 years ago, when she was 13 years old, her stepfather, Fred, repeatedly sexually assaulted her, having intercourse with her, until she reported this abuse and he was removed from the home. Fred pled guilty to this offense. I ask this court to consider three issues individually and the cumulative impact of all three of these issues in determining whether the trial court erred, whether this error was harmless, and whether he should receive a new trial. First, the trial court improperly admitted other crime evidence. Appellant cites this court's ruling in People v. Smith as well as the Supreme Court's ruling in Donahoe. These cases recognize that the passage of time would lessen the probative value of other crime evidence. The logic in Smith and Donahoe is that the passage of time comes with the need for greater similarity between the prior and charged conduct. With the passage of over 20 years, in order to be admissible, the other crime evidence would require idiosyncratic and remarkable similarities, not just threshold or general similarities argued by the State. The trial court claimed that the 1994 conviction and the charged defense against H.V. was remarkably similar. However, the evidence shows that these similarities are minimal and can be found in most cases involving these types of charges. V.E. and H.V. were similar in age, under 13. Both involved acts of penetration, penis to vagina. There is nothing remarkable or remarkably similar about both incidents being in defendant's residence with another person present or in another room. Nor is V.E.'s testimony about being awakened extraordinarily similar to H.V.'s allegation. Again, such evidence is common in these types of cases. I would state that if a trial court is permitted to call this evidence remarkably similar, it is hard to imagine a case that would not satisfy this standard. Remarkably similar has to be more than just magic words that a trial court can use to permit such highly prejudicial evidence. In the case before you, the other crimes involved the defendant as a stepfather 20 years ago, several incidents over the course of months, and threatening V.E. if she told anyone. The charged conduct involved a single incident with no relationship or ability to threaten H.V. Although neither appellant or appellee included any discussion of this court's January 22, 2019, ruling in People v. Kelly regarding other crime evidence under 115-7.4, this ruling, I believe, has application to this case. The state may argue that this ruling applies to Fred's case and that factual differences are incidental and meaningless unless the identity of the perpetrator is at issue and the state pursues a theory of modus operandi, which in that case would require a higher degree of similarity. However, in Kelly, the other crime evidence involved multiple women who testified to more approximate, within a couple of years, extreme domestic violence. Also in Kelly, in paragraph 102, Your Honor, Justice Kavanaugh wrote this opinion. You state that the qualifier of undue is crucial because prosecuting the defendant necessarily entails adducing evidence prejudicial to defendant. All propensity evidence aims to be prejudicial to defendant. Your Honor, you go on to explain the possibility and the opportunity for juries to use it improperly, to just deem the defendant bad and therefore punishing the defendant for just being bad. That is the case, Your Honor, here. Not only was the jury allowed to consider Fred's crimes against V.E., but the trial court also erred by allowing the jury to see documentary evidence, a certified copy of Fred Cox's prior conviction, containing sentencing information. That the punishment for this 1994 crime goes well beyond the intended use of propensity evidence. The jury was allowed to consider that Fred was bad in 1994 and only received jail, probation, and home confinement. And the jury could have concluded that he deserved whatever punishment that could be heaped upon him, regardless of whether he committed offense against H.V. and that this was improper. And the court abused its discretion allowing the sentencing information for the 1994 crime to go back into the jury room for the jury to review. Along with those propensity arguments, we also argue that the prosecutor in this case improperly used that in his closing argument. Counsel, was there an objection to the certified copy of the conviction going to the jury? I believe there was an objection before the trial court was breaking, and then they came back, and then there was no objection. And so there is an issue with waiver here. However, I see my time is up, and I can take my five minutes to address that issue. All right. Thank you, Counsel. Ms. Shepard? Thank you, Court. Counsel? As to Justice Holder White's last question, defense counsel actually affirmatively stated that he had no objection to the certified copy of defendant's prior conviction going to the jury. So that goes beyond mere forfeiture. It's a permanent waiver, invited error. There's no ground for a defendant to gain relief on any issue as to that conviction going to the jury during deliberations. And due to forfeiture, affirmative waiver, and the standard of review, defendant has a steep uphill climb in convincing this Court to accept or even to consider his arguments. Except for Issue 1 regarding admission of DE's testimony, all of defendant's arguments are either affirmatively waived or are forfeited on many grounds, and they're not reviewable as plain error. Even if this Court were to review defendant's forfeited and affirmatively waived arguments, the standard review for all but Issue 3 is abuse of discretion, which defendant cannot establish because he cannot show that the Twelfth Court's rulings were arbitrary, fanciful, or unreasonable, or that no reasonable person would take the Twelfth Court's view. As to plain error, defendant asserts his arguments are reviewable as first-prong plain error because he maintains the evidence is closely balanced. Evidence is closely balanced when the case outcome turns on a contest of credibility, and that occurs when both sides presented plausible version of events and there is no extrinsic evidence to corroborate or contradict either version. Here, any one of several circumstances takes this case out of the realm of closely balanced cases. H.V. consistently and plausibly testified and stated in her CAC interview that she was awakened during the night by a defendant who pulled off her underwear, took his penis out of the hole in his boxer shorts, and assaulted her. She testified and stated in her interview that the contact lasted a few minutes and the defendant then left the room. Her testimony and her statements in her CAC interview were consistent with her statements to her mother and the ER doctor. Her credibility and the reliability of her statements were enhanced by the absence of any motive to lie or acts to grind on her part, by the timing of her report to her mother soon after she got home, by her mother's warning not to say such things unless they were true, after which H.V. did not change her story, and the timing of her other statements the same night in close succession afterward. In addition, her account was corroborated by the physical evidence of the redness on her right labia, which was found in the medical examination conducted less than 24 hours after the assault. It also was corroborated by the propensity evidence of the defendant's prior sexual assaults of V.E. The defendant also gave implausible testimony about whether he knew about her own boxer shorts and that on a trip to the bathroom on the night of the offense, some unknown person opened the door. He was inches away from the person, didn't know who it was, but he knew it wasn't his wife, and that afterward he did not check on his daughter and H.V. Also, there were contradictions among the defense witnesses as to what H.V. was wearing on the night of the offense. The evidence thus was not closely balanced. Even if this Court were to consider it, the defendant's forfeited plain error argument fails to establish plain error. It's the defendant's burden to establish plain error. He failed to meet that burden. This Court should honor his forfeiture and decline to address his forfeited arguments. As to the only argument that was not forfeited, Issue 1, there's no authority that requires that the prior conduct must bear idiosyncratic or remarkable similarities to the charged conduct in order to be admissible. When this Court so described the evidence in Smith, it didn't hold that those qualities were required, but merely described the evidence in that case as having those qualities. This Court in Smith applied the standard the Supreme Court reaffirmed in Donahoe that only threshold similarity is required. The trial court here did not abuse its discretion in finding sufficient similarity here. This Court in Venn Note found strong similarities between the past and charged offenses where the victims of both crimes were nine-year-old boys. In both crimes, the defendant touched a boy's penis, and the defendant was previously convicted of the same crime. Here, the same strong similarities are present. HV and VE were the same age and gender. Defendant's crimes against them involved the same type of sexual contact, and defendant previously pleaded guilty to aggravated criminal sexual abuse of VE, a victim under 13, whereas here he was charged with predatory criminal sexual assault of a victim under 13. So those similarities alone were sufficient to meet the test of general threshold similarity. Additional similarities increased the probative value of the evidence. Both cases involved no preliminary or reciprocal conduct. They occurred in defendant's residence while other adults were present. The victims were children under defendant's supervisory care or control. And defendant assaulted both girls while they were sleeping,  As to the time involved, Donahoe is very clear. Supreme Court said the appellate court has affirmed admission of other crimes' evidence over 20 years old under the exceptions because the court found it to be sufficiently credible and probative, and it held that the length of time alone is not enough to make the evidence inadmissible. It's a long time. Let's see. Moving on to Issue 5, the motion for new trial, meta-motion for new trial. Well, I guess maybe I will not. I will talk about Issue 3. Okay, Issue 3, regarding the prosecutor's remarks in closing argument, that's the only issue that is not subject to an abusive discretion standard. Under this court's decisions, there's a conflict among the districts as to what that standard is, but this court recognizes a de novo standard of review as to that issue. In order for a defendant to succeed on that issue, he would have to show this court not only that the evidence is closely balanced, so as to allow review despite his forfeiture, he also would have had to support his argument with argument and citation to authority in the record, and so as to allow it to adequately evaluate his assertions, and to avoid forfeiture of his arguments because he didn't do that. If, despite defendant's failure to meet those burdens, this court were to reach Issue 3, the defendant still would have to show that the prosecutor's remarks were improper and that they resulted in substantial prejudice to defendant, considering the content and context of the language, its relationship to the evidence, and its effect on defendant's right to a fair and impartial trial. The defendant cannot make that showing. As he makes clear in his reply brief, the error that he asserts is that the prosecutor improperly defined propensity for the jury and gave his personal opinion on how the propensity evidence made H.V.'s testimony more believable. The prosecutor did not err in stating that the propensity evidence could be used to judge credibility or in including himself with the jury in stating that the propensity evidence helped him to judge H.V.'s credibility and that he thought it was going to be helpful to the jury. Defendant provides no authority or argument in support of his conclusory assertion that a fact finder cannot consider propensity evidence in judging credibility, and Hancock is not distinguishable on the ground that in that case, it was an element of the sexually dangerous person defense that, or status that the defendant responded in Hancock was being, whether he was a sexually dangerous person in Hancock. So, as to so many of defendant's arguments, they're forfeited by his failure to provide authority for them. That includes the argument about additional standards for admitting Section 115-10 evidence. In order to find that defendants should get relief on this issue, this court would have to find that the trial court abused its discretion in failing to follow standards that do not apply. And that weren't suggested to the trial court. Pardon me? And that weren't suggested to the trial court. Exactly, Your Honor. Yes, yes. Yes, forfeited for, of course, the plain error doctrine allows review of arguments that are forfeited because they were not suggested to the trial court. Also, he's forfeited his arguments by not supporting them in this court. And, of course, he also forfeited them by not giving this court any direction as to what part of the DVD supposedly violated these standards. As to Issue 5, the amended motion for new trial, despite defendant's opposing counsel's repeated assertions to the contrary, the expert, his own expert, was very clear that there was not semen found. It was only indicated. What they found was there was a protein that was present on his underwear that was present in many bodily fluids, including semen. So the expert could not say. And there was a lot of questioning of the expert on this, including by the trial court. The expert couldn't say that it wasn't vaccine. The defendant failed to show that that DNA evidence was even admissible, where he failed to show that the underwear tested was the same underwear that H.V. put back on after the assault, and he failed to establish chain of custody. Counsel, just as an aside, I don't know that you would, but do you know why it went to trial prior to the DNA evidence being back from the lab? My memory is just that the state lab was backed up. That's what my memory is. I can't say definitively. But as your honors may be aware, there's a chronic problem with that. So as in Brown, the state presented a plausible explanation for the presence of Burton's DNA on the underwear the defendant did not refute. Contrary to, let's see, there was absolutely no evidence that Burton was H.V.'s assailant. The evidence presented showed that he was not. The state's evidence showed that H.V. was awakened and sexually assaulted by a defendant while she was on a sleepover with her friend, defendant's daughter, at defendant's house. And I should also interject that opposing counsel said that H.V. said that she screamed during the assault. H.V. did not testify to that. She never said that she screamed. It was her mother that described her as screaming or crying out, and then the prosecutor asked her, you know, are you saying that she actually said that? And I believe the mother said, well, I just put that together with what she would have done because she said she fought back. But H.V. herself did not actually say that she screamed. She did say that she fought back. So the evidence showed that when H.V. was sexually assaulted, no other male was in the house. H.V. was clear and certain in her identification of defendant, whom she knew as her assailant. While Burton lived with H.V. and her mother, and at and around the time of the offense, he was either at work or at his own home with H.V.'s mother, not in defendant's home. When H.V. reported the offense to him and her mother, Burton ran out the door to defendant's house in order, H.V. testified, to be defended up. The evidence did not support the theory that Burton could have committed the offense. It showed he was not and could not have been H.V.'s assailant. There was no evidence that anyone but defendant committed the offense. And the offense was either committed by defendant or not committed at all. So defendant failed to meet his burden of showing the new DNA evidence was of such conclusive character that it would probably change the result on retrial or even that it was admissible. Denial of defendant's amended motion for new trial was not an abuse of discretion. Unless the court has any further questions or comments, we would simply ask that you refer. Thank you, counsel. Any rebuttal, counsel? Your Honor, I think we kind of left off on whether or not the issue with regard to the objection or whether it was waived on the certified copy of the conviction that went back to the jury. One, the appellant in this case is asking the court to review that on plain air. It was not objected to. I know that in the appellee's brief, they argued that that is completely forfeited and the court should not consider that. I believe they cited the Peel case, and in that case, that involved an ineffective assistance of counsel claim that is not the type of claim that is being made here. And there was a fairly complicated issue regarding, I believe, the definition of the actual crime. The defendant had argued that the trial court and his counsel were wrong for not seeing into the future and realizing the eventual case holding that the term individual within the language of a certain section of the code would be defined to exclude the shooter. It would appear that the court's ruling in Peel that counsel acquiesced and there was an acknowledgement that neither the lawyer or the judge are expected or required to be clairvoyant as to where the law is going. Whereas in Fred's case, Fred's counsel and the court were not faced with a complex legal question regarding unsettled case law. In Fred's case, the jury had asked, can we have all material evidence available? In response, the court answered that they may see four documentary pieces of evidence, one of which was the certified copy of the conviction. His failure to object, counsel's failure to object was based upon the court's prior ruling on the admissibility of the propensity evidence. However, nobody appeared to recognize the fact that Exhibit 1 contained Fred's 1994 sentence to jail, home confinement, and probation. And that the punishment for this 1994 crime goes well beyond the intended use of any propensity evidence. This error was not invited by the defendant. And just of note, the defendant wasn't even asked to be present when the lawyers discussed this issue and responded. But counsel, you agree that in this situation, we didn't have an objection. It wasn't included in the post-trial motion. And not only did we not have an objection, but we had counsel agreeing to it going back. Yes, I agree, Your Honor. But again, this is a continuation of the court's ruling to allow this type of evidence in. And it just is more of the reason that the propensity evidence was highly prejudicial that a jury would look at such a horrible crime in 1994 and then take into a jury room and consider the fact that he was only sentenced to jail, home confinement, and probation. Your Honor, with regards to the remarks at closing argument, the defendant does argue that the prosecutor in his closing argument uses the propensity definition and propensity to say that H.V. is more credible. And there's nothing to support the fact that propensity evidence makes a witness more credible. In fact, at best, propensity evidence says that Fred is more likely to commit that crime again than maybe a normal person. But it doesn't make the facts in this case or the testimony of H.V. more credible. So again, those three issues cumulatively create a reversible error in this case. And therefore, we ask this case or this court to reverse and remand this case for improper. Thank you.